IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CUMBERLAND AND OHIO CO. ) <br> OF TEXAS, *et al.*, ) <br> ) <br>     Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CLINTON C. GOFF, ) <br> ) <br>     Defendant. ) <br> ) | Case No. 3:09-cv-436 <br> Judge Trauger |

## MEMORANDUM

Pending before the court is the defendant Clinton C. Goff's Motion for Summary Judgment (Docket No. 40), to which the plaintiffs have responded (Docket No. 44). For the reasons discussed herein, this motion will be denied.

## INTRODUCTION

This case arises out of securities fraud violations that are the subject of several related lawsuits, some of which are now consolidated before this court under *Waldemar E. Albers Revocable Trust, et al., v. Mid-America Energy, Inc., et al.*, No. 3:07-cv-421 (filed on April 16, 2007). In *Waldemar*, investors sued Mid-America Energy, Inc. ("MAE") and Mid-America Oil & Gas, LLC ("MAO&G"), among others, for the fraudulent sale of unregistered securities. (*See* Case No. 3:07-421, Docket No. 1 at 2.) The investors alleged that certain private placement memoranda issued by the *Waldemar* defendants contained misrepresentations and material omissions and that the defendants intended to defraud the investors, in violation of federal and

1

Tennessee securities laws, as well as common law. (*See id.* at 8-10.)

On September 27, 2007 and June 10, 2008, the court entered default judgments in the *Waldemar* actions totaling $5,720,300, for which MAE, MAO&G, and the other defendants were jointly and severally liable. On November 26, 2008, on the *Waldemar* plaintiffs' motion, the court appointed Cumberland and Ohio of Texas, Inc. ("C&O") as receiver of the assets of MAE and MAO&G, giving C&O the authority to sue and collect obligations on the companies' behalf, including, primarily, money to pay the outstanding judgments that were entered in this court against MAE and MAO&G in 2007 and 2008. (*See* Case No. 3:07-421, Docket No. 109 at 3.)

On May 15, 2009, C&O filed this lawsuit against defendant Clinton ("Clint") Goff, alleging that Goff was the "operations manager" for MAE and had solicited investors for both MAE and MAO&G, along with coordinating sales activities and managing the companies' website. (Docket No. 1 at 4.) C&O asserted claims against Goff for contribution under the Tennessee Securities Act and for common law breach of fiduciary duty. (*Id.* at 4-6.) On October 22, 2009, the court granted Goff's motion to dismiss the contribution claim as time barred.[1] (Docket No. 23 at 11.) On February 16, 2010, in a separate action filed in this court (Case No. 3:10-cv-0154), a group of eleven individual investors in MAE and MAO&G sued Goff, and, on April 8, 2010, the court granted the plaintiffs' unopposed motion to consolidate the

---

[1]The claim at issue in the October 22, 2009 Memorandum was a contribution claim under the Tennessee Securities Act asserted by the receiver on behalf of MAE and MAO&G, and the court found that that claim was barred by the relevant statute of repose, as the receiver was imputed to have the knowledge of MAE and MAO&G for claim accrual purposes. (Docket No. 23 at 5-6.) No challenge to the timeliness of the claims asserted by the individual investors has been advanced by the defendant in this round of briefing.

individual investors' lawsuit with this lawsuit brought by C&O. (Docket No. 27.)

After receiving leave, the plaintiffs' (C&O and the individual investors) then filed their Second Amended Complaint on July 26, 2010. (Docket No. 31.) In the Second Amended Complaint, the individual investors allege that Goff violated the Tennessee Securities Act and seek rescission of their investment in MAE and MAO&G on that basis. (*Id.* at 7-8.) Additionally, C&O, as receiver, asserts a claim against Goff for breach of fiduciary duty to MAE and MAO&G, and all plaintiffs bring a claim for civil conspiracy. (*Id.* at 8-10.) On March 28, 2011, following considerable discovery, Goff moved for summary judgment on all claims. (Docket No. 40.) The factual details of Goff's involvement with MAE and MAO&G are discussed below.

## FACTUAL AND PROCEDURAL BACKGROUND

Prior to joining MAE and MAO&G, defendant Goff ran another oil and gas drilling and development investment company called Warren Exploration, which, as of 2003, was located in Portland, Tennessee.[2] For months prior to January 2006, Goff acted as a "reference" for MAE President Gary Milby and generally assisted Milby with the MAE business. (Docket No. 44 Ex.

---

[2] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket No. 44 Ex. 1) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Along with responding to Goff's Statement of Material Facts, the plaintiffs filed their own Statement of Additional Material Facts, to which Goff has not responded. (Docket No. 44 Ex. 1.) Under the Local Rules, Goff's failure to respond indicates that these statements are not disputed for purposes of the summary judgment motion. L.R. 56.01(g). To be clear, even if Goff had not conceded key facts, the record would still present ample basis for denying the defendant's motion.

1 at 12.) As part of this assistance, Warren Exploration prepared the private placement memoranda that were used by MAE for distribution to potential investors.

In late 2005, Goff and Milby engaged in eventually fruitful discussions about combining the two operations. At his deposition, Goff asserted that he agreed to bring his staff over to MAE on the condition that he would have "no responsibility" at MAE; that is, he would not be an officer, director, or "have anything to do with sales." (Docket No. 46 Ex. 18 at 23.) In January 2006, Milby and Goff agreed that Warren Exploration would became part of MAE, and, with the merger, Warren Exploration's staff joined MAE and MAE moved from its Hendersonville, Tennessee offices to Warren Exploration's office in Portland, Tennessee. Goff's official new title at MAE was "operations manager."

MAE sold limited liability partnerships in its oil and gas drilling operations (which were largely conducted on "oil fields" in Kentucky), and it initially marketed itself by seeking investors through advertising on XM radio, in newspapers and on its website.[3] The radio and newspaper ads were running around the time of the merger in January 2006 and possibly ran as late as July 2006. Potential investors would call MAE sales personnel in response to the ads, and the salesperson would walk the interested potential investor through the investment process. Eventually, based on a suggestion that Goff made to Milby pre-merger, MAE added a "cold calling" element to its marketing scheme, whereby the company purchased "leads" on potentially interested investors from a third party and then made "cold calls" to those leads.

---

[3]The MAE website looked "very similar" to the Warren Exploration website and used many of the same photographs of purported drilling operations. (Docket No. 44 Ex. 1 at 12.)

The parties primarily dispute Goff's role at MAE.[4] Goff maintains that he was exhausted from running Warren Exploration and that he had no interest in running a company such as MAE. Therefore, his role mostly involved fairly specialized "clerical services," including dealing with a considerable backlog of paperwork and filings that Milby had allowed to pile up to "two feet high," fixing phone systems and copiers, and updating the website with basic raw, well production data. (Docket No. 46 Ex. 18 at 58.) Goff stressed that MAE was under investigation from almost the moment that he arrived and, therefore, between responding to requests from regulators and frustrated investors and dealing with the filing "backlog," he was "inundated . . . with paperwork" from the outset. (*Id.* at 145, 176.) Consistent with this, Goff maintains that he did not supervise the accounting or sales departments. (*Id.* at 155-158.)

The plaintiffs strongly dispute that Goff's role was limited to "clerical services." Melissa Chapman, who worked as a secretary for MAE while Goff was "operations manager," testified at her deposition that Goff's role with MAE was considerable and began even prior to the merger. She confirmed that there was some connection between Milby and Goff prior to the merger such that Warren Exploration drafted the prospectuses and private placement memoranda eventually used by MAE to recruit investors. (Docket No. 46 Ex. 2 at 31.) After the merger, according to Chapman, "Clint was the boss there unless Gary was there," such that Goff could be considered the "vice president." (*Id.* at 98, 113, 119.)

---

[4]It is undisputed that Goff did not perform certain functions at MAE. That is, other than providing basic, raw well production data, Goff did not add content to the website, and Goff did not personally place advertising for MAE with XM radio or give his authorization to be used as the contact person for XM radio. Also, there is no dispute that Goff did not know that investor money was being deposited in a controversial account known as the Arimor Trust.

5

Chapman testified that, consistent with this role, Goff (1) designed the scheme by which investors were "cold called," (2) attended high level meetings in the company regarding legal compliance, (3) helped set salesperson commissions, (4) hired and fired employees, and (5) generally supervised the salespeople and the accounting department. (*Id.* at 104-105, 110-113.) She also generally testified that the financial situation at MAE began to break down after Goff's arrival, as MAE agreed to take on a considerable amount of debt owed by Warren Exploration, and she claimed to have observed a specific incident in which Goff was involved in "fabricating run tickets," or misrepresenting to investors the quantity of oil being produced by the wells. (*Id.* at 41-45.)

Robert Waller, who was Chapman's boyfriend during the relevant time period, worked for MAE in sales beginning in the Summer of 2005. (Docket No. 46 Ex. 1.) The plaintiffs filed Waller's affidavit, in which he maintains that he met Goff at MAE's Hendersonville office prior to the merger, and he understood that, with the merger, Goff and Milby were going to run MAE "50-50." (*Id.* at 2.) Prior to the merger, Waller claims, Goff was frequently in the Hendersonville office, observing the sales team. (*Id.*)

Following the merger, Waller maintains that Goff was second in command (to Milby) at MAE and that Goff directly supervised David Greenlee, who was the sales supervisor. (*Id.*) According to Waller, Goff continued to frequently supervise the salesmen and also gave pep talks, using his preferred motivational saying "ABC," or "Always Be Closing." (*Id.* at 3.) Waller stated that he would often use Goff to close difficult sales to reluctant investors or would refer a frustrated investor to Goff. (*Id.* at 3.) Moreover, Waller stated that he personally

observed Goff meeting with investors both in the office and out in the oil fields. (*Id.*)

Waller also testified that Goff knew of and was involved in financial malfeasance at MAE. For instance, Waller claims, when Goff was "in the field" meeting a prospective investor, he (along with Milby) "would adjust settings on the well so that pressure would build up allowing them to 'blow out' the well while the prospective investor was being shown around." (*Id.*) Also, when commission checks stopped being issued to employees, Waller confronted Goff, who told him that commissions were now being held in escrow. When Waller asked for some of that money out of escrow, Goff stated that the money was inaccessible to Waller because it was being held "off shore," although Goff was eventually able to access the money to help Waller purchase a car. (*Id.* at 4.)

Zelicia Cutrer was the bookkeeper at MAE. (Docket No. 46 Ex. 6 at 21.) She also gave deposition testimony indicating that Goff was centrally involved in the day-to-day operations of the Portland, Tennessee office of MAE. (*Id.* at 27.) She testified that Goff authorized wire transfers and would tell her the amount of the wire and who to send it to. (*Id.* at 22-23.)

MAE's operations began to wind down in July 2006 in the wake of several state securities fraud investigations. On July 25, 2006, Goff, Milby, MAE and others entered into a written stipulation with the California Department of Corporations, stipulating that they had offered and sold securities in violation of state securities law and agreeing to desist and refrain from the continued sale of illegal securities. (Docket No. 46 Ex. 21 at 1-7.) MAE closed its doors in September 2006.

At the time of closing, all of MAE's funds were sent to Bryan Coffman, MAE's counsel,

by either Keith Gillespie or N.A. Barnett, both of whom worked in MAE's accounting department. Coffman, Gillespie and Barnett had all worked with Goff or Warren Exploration prior to the merger. The funds were to be held in escrow but have disappeared. Civil and criminal suits are currently pending against Coffman for his alleged mishandling of the considerable funds that were to be placed in escrow. (See M.D. Tenn. Case No. 3:09-cv-182, Docket No. 83.)

Aside from Greg Vogel and Eric Taylor, each of the individual investor plaintiffs (Russell Belsaas, Laird and Loretta Robinson, Chuck Greene, Tom and Kathy Martin, Timothy Dienhart, Richard Weber and Gregory Stepro) made a series of investments in MAE during the course of the first half of 2006, with the earliest investments coming in January. (Docket No. 43 Exs. 2-8.) Vogel and Taylor made their investments in November and December 2005. (Docket No. 43 Exs. 9-10.) All plaintiffs lost all, or virtually all, of their investment. (Docket No. 43 Exs. 2-10.)

The testimony of the individual investor plaintiffs revealed varying levels of interaction with Goff. For instance, Gregory Stepro testified that he relied on Goff for post-investment status updates, and he generally viewed Goff as in charge of sales. (Docket No. 46 Ex. 15 at 25-29). Fred Vogel and Chuck Greene, on the other hand, testified that they had not spoken to Goff prior to their depositions in this case, only receiving a few "well program update letters" or e-mails from Goff, in which Goff represented himself as an operations manager with a wealth of experience in the oil and gas industry. (Docket No. 46 Ex. 17 at 12-13; Docket No. 46 Ex. 11 at 14-15.) Plaintiff Timothy Dienhart testified that, after his first investment, he received a

8

promotional packet from Goff and, after discussing the materials with Goff on the telephone, he decided to make a second and third investment. (Docket No. 46 Ex. 10 at 14-16, 22.).  And plaintiff Laird Robinson testified that, during a visit to the MAE office in April 2006, Goff made a series of statements assuring him and his wife of the "can't miss" nature of the investment, appeared to be in charge of "getting things done" at MAE, and directly assisted them (obtained the paperwork, witnessed the signing of the relevant documents) in making an investment in a well called Black Gold #10. (Docket No. 46 Ex. 13 at 18-22, 31.)[5]

## ANALYSIS

**I.    Summary Judgment Standard**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the

---

[5] As additional examples, plaintiff Eric Taylor testified that he had only spoken to Goff on the telephone and only after he had made his investment. (Docket No. 46 Ex. 16 at 16, 21.) Taylor maintained that Goff refused to provide him proof to support Goff's statement that investors were actually receiving checks. (*Id.* at 18.) Tom Martin testified that, prior to making an investment, Goff, who appeared to be an "owner" and in charge of sales, gave him a tour of the office. (Docket No. 46 Ex. 12 at 6, 12-14.) Russ Belsaas testified that he met Goff during a post-investment tour of the office in March 2006, and he recalled that Goff had referenced his substantial experience in the oil and gas industry. (Docket No. 46 Ex. 9 at 12-13.)

9

pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir.2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan,* 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson,* 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan,* 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)).

## II.  Goff's Motion for Summary Judgment

### A.  Tennessee Securities Act Claim

The individual investor plaintiffs, relying on T.C.A. § 48-2-104(a), § 48-2-121, § 48-2-122(a), and § 48-2-122(g) seek rescission of their investment from Goff due to his alleged violations of the Tennessee Securities Act. (Docket No. 31 at 7-8.) The statutory framework involved is as follows:

– Section 104(a) makes it unlawful for any person to sell any security in the State of Tennessee unless the security is registered, or is lawfully exempt from registration.[6]

---

[6] For the purposes of the defendant's motion, there appears to be no dispute that (1) the oil and gas partnerships sold by MAE were "securities" as that term is defined by Tennessee law, (2) the securities were sold in Tennessee, and, (3) in light of the manner in which the securities were advertised and sold, the securities were not properly registered or exempt from registration.

10

– Section 121(a) makes it unlawful for any person, "in connection with the offer, sale or purchase of any security" in the State of Tennessee to (1) employ any device, scheme or artifice to defraud, (2) make any untrue statement of a material fact or make a misleading omission, or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

– Section 122(a) imposes liability upon any person who sells a security in violation of Section 104(a) or Section 121(a) and makes rescission the remedy for an investor who purchases a security sold in violation of either Section 104(a) or Section 121(a).

– Section 122(g) states that every "person who directly or indirectly controls a person liable under this section, every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the person who would be liable under this subsection (g) proves that the person who would be liable did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable."

The defendant maintains that the viability of the Tennessee Securities Act claims comes down to whether the record sufficiently shows that he "materially aided" the transactions at issue. (Docket No. 41 at 6.) The defendant relies almost entirely on his own deposition testimony, arguing that the individual plaintiffs could not pin down his role in their depositions and that he is the only individual who can aptly describe his (limited) role at MAE. (*Id.* at 2, 5.) Moreover, Goff maintains, he played little role in convincing the individual investor plaintiffs to make investments – again, he had a limited role with the website, did not place the XM radio ads, and, the record shows, some individual investor plaintiffs (Vogel and Taylor) made their entire investments prior to the merger and, for most plaintiffs, Goff played no direct role in any

---

(Docket No. 44 at 12 citing T.C.A.§ 48-2-102(17); T.C.A. § 48-2-103; T.C.A. § 48-2-102(8)).

11

purchasing decisions. (*Id.* at 2-4, 7-8.) In sum, the defendant contends, "there is no admissible evidence that contradicts Mr. Goff's assertion that he had no responsibility for investor solicitations, creating the content of any advertising, or supervising sales personnel." (*Id.* at 6.)

In response, the plaintiffs, not surprisingly, begin by pointing out the clear factual disputes as to Goff's role at MAE – that is, Goff claims that he was a "clerical" employee, while significant testimony indicates that Goff had a central role at MAE, directly overseeing the sales and accounting departments and potentially being involved in financial malfeasance at MAE. (Docket No. 44 at 8-11.)

Moreover, the plaintiffs argue, Goff's liability under Section 122(g) may be premised on more than a theory of "material aid." (*Id.* at 13.) That is, a reasonable jury could impose Section 122(g) liability under the theory that Goff was a "control person," a "partner," an "officer" or because he held a "similar status." (*Id.* at 13- 14 citing *Cannon v. GunnAllen Fin. Inc.*, 2007 WL 2351313, *4 (M.D. Tenn. Aug. 14, 2007)(Trauger, J.)(control person has the power to control and does control the operations of the primary violator)). The plaintiffs point out that Chapman and Waller both provided evidence that Goff was in charge (or in control) of sales at MAE, directing the "cold calling" operation, supervising the sales staff, and setting commission levels. (Docket No. 44 at 14.) Additionally, the plaintiffs maintain, the testimony of Waller and Chapman supports a reasonable conclusion that Goff was generally a partner or officer at MAE, splitting oversight duties with Milby. (*Id.* at 15-16.)

Further, the plaintiffs argue that there is "ample proof in the record" of material aid by Goff as both an employee of MAE and as an agent of MAE. (*Id.* at 16 citing *Cannon*, 2007 WL

12

2351313, *6, which defined "material aid" as conduct with a "natural tendency to influence" the decision of the purchaser.) The plaintiffs point to the testimony in the record that Goff met with potential investors (including some of the plaintiffs in this case), advised Milby on how to devise a cold-calling scheme, and, through his company Warren Exploration, prepared the private placement memoranda sent to MAE investors. (*Id.* at 16-17.) Additionally, the plaintiffs point to the testimony that Goff oversaw, "coached, supported, and assisted" the sales team that "ultimately made every last sale of securities to the Individual Plaintiffs," as well as actually sold securities to the Robinson plaintiffs and plaintiff Dienhart. (*Id.* at 17.)

The defendant's argument, that he was so little involved in the day-to-day affairs of MAE that he could not be reasonably found to have liability for the alleged illegal securities sales at MAE, is plainly without merit. Through the testimony of former employees and the plaintiffs themselves, the plaintiffs have offered more than sufficient testimony that Goff played a key role at MAE generally and a key supervisory role on the sales team that made the allegedly improper sales of securities to the plaintiffs.[7] The evidence is such that his liability for the improper sale of securities at the company could be reasonably based on several theories, including that of a "control person," a partner or officer (or of similar status), or one who provided "material aid." The defendant's motion for summary judgment on the Tennessee Securities Act claim will be

---

[7]As noted above, with the exception of plaintiffs Taylor and Vogel, each of the plaintiffs purchased securities following the merger, when, a reasonable jury could find, Goff was a "control person," partner, etc. at MAE. The fact that Vogel and Taylor purchased their securities shortly before the merger is not fatal to their claims because of the evidence, discussed above, that there was an ongoing association between MAE and Goff for months prior to merger, during which time a reasonable jury could find (for instance) that Goff held a similar status or performed similar functions to partner, officer, or director.

denied.

B.     **Breach of Fiduciary Duty**

As the defendant recognizes, corporate managers and employees who occupy positions of trust and confidence with the corporation, such as officers, directors and agents under the control of the president, owe a fiduciary duty to the corporate entity to protect its interests. (Docket No. 41 at 9; *see also May v. Nat'l Bank of Commerce*, 387 F. Supp.2d 770, 779 (W.D. Tenn. 2004)). When these employees act with "their inattention to the duties of their trust" or do not act with good faith toward the corporation, they are liable for the losses caused by corporate waste and mismanagement under a breach of fiduciary duty theory. *May*, 387 F. Supp. 2d at 779; *Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir. 1980).

Goff argues that he did not owe a fiduciary duty to MAE because the record shows that, at most, he "was entrusted by MAE with management over certain clerical duties in the office, but not with the offering and sale of securities." (Docket No. 41 at 10.) Additionally, the defendant argues, even if he did owe a fiduciary duty to MAE, there is no evidence that he breached that duty because there is no evidence that Goff "was responsible for the specific activities" that the plaintiffs have alleged were improper in this case, such as the sale of unregistered securities and the improper diversion of assets. (*Id.*)

The plaintiffs respond that, once again, Goff has simply ignored the record. (Docket No. 44 at 18.) That is, there is ample evidence that Goff was the "number two" at MAE, answerable to Milby but also "at the center of the company's sales operation, undertaking to supervise, coach, assist and otherwise manage MAE's sales force for the purpose of transacting company

14

business." (*Id.* at 19..)  Moreover, there is clear evidence of breach.  That is, Chapman testified that Goff "fabricate[d] run tickets," and Waller stated that Goff tinkered with the wells to make them appear more productive.  (*Id.*)  Additionally, the plaintiffs argue, a reasonable jury could find that Goff breached his fiduciary duties by directing a sales team that was, every day, violating securities law and by allowing Coffman to assume control of investor assets.  (*Id.*)

Once again, the plaintiffs have produced more than sufficient evidence to survive summary judgment on this claim.  There is considerable evidence that, whether it was as an officer, director, or agent, Goff was in a position of sufficient authority and control over the affairs of MAE that a reasonable jury could find that he owed MAE a fiduciary duty and, given the considerable evidence that connects Goff to the sales teams and to specific troubling transactions and practices, a reasonable jury could also find that Goff breached his fiduciary duty to MAE.  Therefore, the defendant's motion for summary judgment on this claim will be denied.

### C. Civil Conspiracy

Under Tennessee law, a civil conspiracy is "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *O'Dell v. O'Dell*, 303 S.W. 3d 694, 697 (Tenn. Ct. App. 2008).  Goff argues that there is no evidence of a "common design" or any evidence that he was "aware of any scheme" to violate securities laws.  (Docket No. 41 at 11.)  The plaintiffs point to much of the evidence discussed above to show that there are at least disputed issues of fact as to what Goff knew about the dishonest statements and practices directed at investors and to what degree he was a willing

participant in advancing that pattern of dishonesty with regard to the sale of securities at MAE. (Docket No. 44 at 20-21.)

Once again, the plaintiffs are clearly correct. The testimony of Chapman and Waller, among other evidence, provides support for a reasonable jury to find that Milby and Goff worked together over a period of time to improperly sell unregistered securities and to make false statements and representations to investors. Therefore, the defendant's motion for summary judgment on this claim will also be denied.

## **CONCLUSION**

For the reasons discussed herein, the defendant's Motion for Summary Judgment will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge